ALISON J. NATHAN, District Judge:
On November 14, 2017, the Defendants filed a motion to dismiss Plaintiff's complaint for lack of subject matter jurisdiction. Dkt. 19. On August 27, 2018, Magistrate Judge Barbara Moses recommended that this Court dismiss all of Plaintiff's claims. Dkt. 62. Plaintiff filed objections on September 7, 2018. Dkt. 65. Defendants responded to these objections on September 20, 2018. Dkt. 66.
The Court reviews de nova the portions of the Report and Recommendation to which timely objections were made. See, e.g. , Beller v. Astrue , No. 12 CV 5112 VB, 2013 WL 2452168, at *1 (S.D.N.Y. June 5, 2013) (citing 28 U.S.C. § 636(b)(1)(C) ). This Court has considered Magistrate Judge Moses' Report and Recommendation and the parties' written submissions regarding objections. Finding no error in Judge Moses' thorough and well-reasoned report, the Court hereby overrules the objections and adopts the Report and Recommendation in full as the opinion of the Court. Therefore, Plaintiff's conversion, replevin, declaratory judgment, and copyright claims are hereby DISMISSED without prejudice. The Clerk of the Court is directed to close item number 19 on the docket of this case.
SO ORDERED.
REPORT AND RECOMMENDATION TO THE HONORABLE ALISON J. NATHAN
BARBARA MOSES, United States Magistrate Judge.
The primary issue in this case is whether plaintiff Architectural Body Research Foundation (ABRF) or the estate of Madeline Gins (the Estate) is the rightful owner *626 of a "conceptual work of art" created by Gins, who died in January 2014, and her husband Shusaku Arakawa, who predeceased her. Gins's will, which was admitted to probate in February 2014, leaves the bulk of her estate - including the disputed work, if it was hers to bequeath - to defendant Reversible Destiny Foundation, Inc. (RDF). In this action, filed in October 2017, ABRF sues RDF, the Estate, and its executors, seeking orders requiring the "immediate[ ] return" of the work, a declaration that ABRF is its "sole and exclusive owner," and damages for copyright infringement. The copyright claim furnishes the sole independent basis for subject matter jurisdiction in this Court.
Now before the Court is defendants' motion, made pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss all of ABRF's claims for lack of subject matter jurisdiction. (Dkt. No. 19.) Defendants rely on the "probate exception," which "precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." Marshall v. Marshall , 547 U.S. 293, 312, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006). For the reasons that follow, I respectfully recommend that Your Honor:
1. DISMISS all claims against the Estate, pursuant to Fed. R. Civ. P. 17(b), for lack of capacity to be sued;
2. GRANT defendants' Rule 12(b)(1) motion with respect to plaintiff's conversion, replevin, and declaratory judgment claims, and DISMISS these claims WITHOUT PREJUDICE; and
3. GRANT the Rule 12(b)(1) motion with respect to plaintiff's copyright infringement claim, and DISMISS that claim WITHOUT PREJUDICE; or, in the alternative,
4. DISMISS the copyright infringement claim WITHOUT PREJUDICE pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief can be granted, and grant plaintiff leave to amend within 30 days.
I. BACKGROUND
A. The Mechanism of Meaning
The work in dispute is one of two major versions or "editions" of an ambitious project, created by Arakawa and Gins over several decades, entitled The Mechanism of Meaning . Each edition comprises approximately 80 painted panels and other elements, see Compl. (Dkt. No. 1) ¶¶ 2, 5, 16-17, and each evolved over time. See id. ¶¶ 16-17, 42-43.
More than 30 years ago, in 1987, the artists executed a Deed of Gift (Deed) to ABRF, a non-profit foundation formed by them that year.[1] The Deed, annexed to the Complaint as Exhibit 1 (Dkt. No 1-1), transferred to ABRF "all right, title, and possession, including literary rights including copyright," to the works "more fully described in Schedule A." Schedule A, in turn, identified the property being transferred as "The Mechanism of Meaning," and went on to describe, in some detail, 82 individual painted panels, each of them 5 feet 8 inches by 8 feet. Id. at ECF page 3. The Deed did not mention the existence of more than one edition of the property being gifted. Nor did it list any physical components of the gift other than the panels described on Exhibit A, even though The Mechanism of Meaning was an "ongoing work," Compl. ¶ 16, which existed "in different mediums, including a series of publications, drawings and paintings." Id.
*627 In 1989, ABRF sold one edition of The Mechanism of Meaning (referred to herein as the Sezon Edition) to the Saison Foundation, acting on behalf of what is now known as the Sezon Museum of Modern Art in Japan, for $3 million. Compl. ¶¶ 5, 17. According to the Sales Agreement between ABRF and the Saison Foundation, signed by Gins, ABRF conveyed "1 set of the 'Mechanism of Meaning,' " including "81 paintings, 45 drawings, and 1 architectural model." Compl. Ex. 7. The Sezon Edition, completed in 1988, was "the second of the two large editions" of The Mechanism of Meaning created by Arakawa and Gins. Compl. ¶¶ 17, 40-42.
At issue here is the ownership of the other "iconic" edition of The Mechanism of Meaning , see Compl. ¶ 5, which remained in the artists' possession and is now, according to defendants, an asset of Gins's Estate (referred to herein as the Estate Edition). During their lifetimes, Arakawa and Gins continued to modify the Estate Edition and treated it, at least for some purposes, as their personal property, including the associated intellectual property. For example, the couple personally loaned the Estate Edition to the Guggenheim Museum (Guggenheim) in 1996, for an exhibition which opened in 1997. The Loan Agreement, which ran between the artists and the museum, described the loaned work as "The Mechanism of Meaning (84 paintings)" and did not mention ABRF. See Declaration of Ronald D. Spencer, Esq. (Dkt. No. 20), ¶¶ 21-23 & Ex. G. The Guggenheim catalog for the exhibition listed - and included images of - 82 "panels," all from "the artists' collection." Id. Ex. G, Ex. H, at ECF pages 2 ("all works are in the artists' collection"), 4-56 (images of panels), 57-58 (list of panels). The last two panels "dat[ed] from 1996." Id. at ECF page 57. The catalog also included the notation: "All Arakawa and Madeline Gins works ©1997 Arakawa and Madeline Gins." Id. at ECF page 2.[2]
Although ABRF was exempt from income tax, it was required to file both federal and state informational returns. Most of the returns were signed by Gins and/or Arakawa. None of them listed any edition of The Mechanism of Meaning (or, for that matter, any other artwork) as part of ABRF's assets. Nor was there any mention of the sale of the Sezon Edition in 1988. See, e.g. , Declaration of David R. Baum (Dkt. No. 42), Ex. 4 (federal and state return for 1988); id. Ex. 5 (federal return for 1989, the year in which the Sezon Edition was sold); Spencer Decl. ¶¶ 29-32 & Exs. I-L (federal and state returns for 2005 and 2006).
Beginning with the 1997 returns, ABRF reported, in its attached "Statement of Program Service Accomplishments," that the Guggenheim had exhibited "models and drawings of the Foundation's work." See, e.g. , Baum Decl. Ex. 1 (portions of federal return for 1997); Spencer Decl. Ex. J (federal return for 2005). These Statements did not mention the paintings, which (at least according to the Guggenheim catalog) were the heart of The Mechanism of Meaning - and belonged to the artists themselves.
B. Death of the Artists
Arakawa died intestate on May 12, 2010. Compl. ¶ 5; Spencer Decl. ¶ 33. Thereafter, *628 acting in her capacity as his administrator, Gins signed estate tax returns reporting that Arakawa owned artwork valued at more than $27 million at the time of his death, including "Mechanism of Meaning Paintings" appraised at $4,980,000 by the firm of O'Toole-Ewald Art Associates, Inc. (O'Toole-Ewald). Spencer Decl. ¶¶ 34-37 & Exs. M-N.
Gins died testate on January 8, 2014. Compl. ¶ 5. On February 27, 2014, her will was admitted to probate in the Surrogate's Court for the County of New York, which issued letters testamentary appointing defendants Ronald Spencer, Michael Govan, and Stephen Gins as her executors. Compl. ¶¶ 8-11, 27; see also Spencer Decl. ¶¶ 4-5 & Ex. B; Reply Declaration of Ronald D. Spencer, Esq. (Dkt. No. 45), Ex. A. Spencer is an attorney at Carter Ledyard & Milburn LLC, Compl. ¶ 9, who began representing Gins in 2010. Transcript of Deposition of Ronald D. Spencer, Esq. (Spencer Dep. Tr.) (Dkt. No. 42-10), at 20:12-17. Govan was the organizer of the 1997 Guggenheim exhibition, see Spencer Decl. Ex. H, at ECF page 2, and is now the director of the Los Angeles Museum of Art. Compl. ¶ 10. Stephen Gins is a brother of Madeline Gins. Id. ¶ 11.
At the time of her death, Gins resided in a townhouse at 124 West Houston Street in Manhattan, which also served as the couple's long-time studio and art storage space. See Spencer Decl. ¶¶ 10-11; Declaration of Johanna Post (Dkt. No. 27), ¶ 7; Spencer Dep. Tr. at 128:10-130:24. ABRF's offices were located in the same building for "many years," but were "shut down in 2008," Post Decl. ¶¶ 6-7, for reasons described below.
Sometime in 2014, Gins's executors caused her extensive art collection - including the Estate Edition of The Mechanism of Meaning - to be removed from the townhouse and placed in a climate-controlled art storage facility, where it remains today. Spencer Decl. ¶¶ 11-13, 19, & Exs. C-D. There is no evidence that the Estate Edition was segregated or labeled in any way that suggested it was not Gins's personal property. According to Spencer, the works in the townhouse "sometimes" bore labels, but the labels "didn't identify who owned the work." Spencer Dep. Tr. at 130:10-20.
On April 8, 2015, the Estate filed a List of Assets-Inventory (Inventory) in the Surrogate's Court, reporting that the Estate included $9,642,934 in "Miscellaneous & Trust Property" consisting of "Artwork created by the decedent, her deceased spouse Shusaku Arakawa, and others." Reply Declaration of Judith M. Wallace, Esq. (Dk. No. 47), Ex. B, at 1, 9. The $9.6 million figure was based on an appraisal by O'Toole-Ewald, dated March 26, 2015, which the Estate did not file in the Surrogate's Court but did produce in this action. Wallace Reply Decl. Ex. C. According to the appraisal, the fair market value of "Mechanism of Meaning Paintings" was $4,980,000 "before blockage discount," and $1,245,000 "after blockage discount." Id at 22.[3]
Gins's will provided for three cash bequests and "left the balance of her estate *629 to RDF." Compl. ¶ 27. RDF was formed by Arakawa and Gins in March 2010, shortly before Arakawa's death, "as a new foundation to promote the work and philosophy of Arakawa and Gins that focused on architectural design as a tool to extend life, and to explore how not to die." Id. ¶ 22.
The formation of RDF was not prompted entirely by the artists' evolving philosophic interests. ABRF had invested significant funds, over at least two decades, with Bernard Madoff Investment Securities, LLC. Compl. ¶¶ 3, 20-21. In late 2008, ABRF learned that its Madoff accounts were "worthless." Id. ¶ 21. This forced ABRF to "dramatically scale[ ] back its work," id. ¶ 3, and shut down its office at 124 West Houston Street. Post Decl. ¶¶ 6-7. See also Spencer Reply Decl. Ex. B (email from Post stating that "Arakawa and Madeline closed the office that was operating under ABRF in December 2008 after the Madoff scandal broke"). Worse yet, the trustee appointed to recover funds for the benefit of Madoff victims asserted a "claw-back" claim against ABRF, to which it had "no meaningful defense." Compl. ¶ 25. Thus, "the new foundation was also formed due to a concern that ABRF's future would be negatively impacted, if not terminated, by any judgment recovered by the Trustee." Id. ¶ 4.
During their lifetimes, Arakawa and Gins, together with nonparty Momoyo Homma, served as directors of both of the foundations they created: plaintiff ABRF and defendant RDF. Compl. ¶¶ 23, 29. After the artists' deaths, Homma remained as a director of both foundations but control otherwise diverged. Homma appointed Johanna Post and her husband Andrew MacNair (both long-term associates of the artists) to the ABRF board. Id. ¶¶ 30-32; see also Post Decl. ¶ 5. The RDF board now includes Homma; defendants Spencer and Govan, and nonparty Alexandra Munroe, a senior curator at the Guggenheim. Compl. ¶¶ 9-10; Declaration of Judith M. Wallace, Esq. (Dkt. No. 21), Ex. A, at 9:16-10:18.
On October 7, 2015, ABRF director MacNair wrote an email, addressed to the executors of the Estate, stating, "It appears that the Estate of Madeline Gins has possession of assets that belong to ABRF, Inc.," referencing The Mechanism of Meaning . Compl. ¶ 40 & Ex. 5. MacNair requested "a return of ABRF assets in the current inventory of the Estate of Madeline Gins." Id. The Estate rejected the request. See id. ¶¶ 40-43. Two years later, on October 10, 2017, ARBF filed this action.
C. Plaintiff's Claims
ABRF's contention, in a nutshell, is that when Arakawa and Gins gifted The Mechanism of Meaning to ABRF in 1987, they intended to transfer all right, title and interest to each and every edition of the work, past and future, as well as all associated copyrights. See, e.g. , Compl. ¶ 18 ("The Deed of Gift was drafted to gift the entirety of The Mechanism of Meaning in all of its forms, stages, and editions to ABRF."). Because the language of the 1987 Deed is less than clear on this point, ABRF also relies on the post-gift conduct of the donors. Plaintiff notes, for example, that the Sezon Edition, as sold in 1989, included not only 81 "paintings" (roughly corresponding to the 82 panels listed on Exhibit A to the 1987 Deed of Gift) but also "45 drawings and 1 architectural model," suggesting that ABRF owned more than the panels listed on Exhibit A. See Compl. ¶ 43. Therefore, according to ABRF, the Estate Edition did not belong to Arakawa at his death, nor to Gins at her death. By the same token, ABRF contends, the Estate Edition is not now rightfully *630 owned by her Estate, and cannot be bequeathed to RDF. Id. ¶¶ 38-43.
In this action, ABRF alleges a federal claim for copyright infringement pursuant to 17 U.S.C. §§ 106 and 501, Compl. ¶¶ 49-55; a declaratory judgment claim pursuant to 28 U.S.C. § 2201, id. ¶¶ 56-59; and state law claims for conversion and replevin, id. ¶¶ 60-67, all asserted against RDF, the Estate, and its executors. In its copyright claim, plaintiff alleges that since Gins's death, RDF has published, and the Estate has purported to give others the right to publish, images of certain panels from The Mechanism of Meaning . Compl. ¶¶ 12, 44-47. For example, RDF's website "features high resolution photos of five panels," published without plaintiff's permission. Id. ¶ 44. On its copyright claim, ABRF seeks damages, an injunction prohibiting further infringement, and a constructive trust over any "profits attributable to the infringement." Id. at 19.
In its declaratory judgment claim, plaintiff seeks a judgment declaring that it "is the sole and exclusive owner of The Mechanism of Meaning in its entirety." Compl. at 19.
In its state law claims for conversion and replevin, plaintiff alleges that defendants "refused to respond in writing" to MacNair's October 2015 demand and thereafter "refused to return the [Mechanism of Meaning ] to ABRF." Compl. ¶¶ 61, 65. Plaintiff does not allege that Gins committed any wrongdoing in 2011, when - as Arakawa's administrator - she signed estate tax returns stating that he owned the Estate Edition at his death. See Spencer Decl. ¶¶ 34-37 & Ex. M.[4] Nor does it allege that her executors engaged in misconduct in 2014, when they arranged for her art collection to be packed and stored. With respect to both state law claims, ABRF seeks the "return" of the property "in its entirety," see Compl. ¶ 5, including "all physical works and intellectual property," together with an accounting of any sales or licenses, "any appropriate compensatory damages," and punitive damages. Id. at 19-20.
D. The Motion to Dismiss
Defendants filed their motion, pursuant to Fed. R. Civ. P. 12(b)(1), on November 14, 2017. They argue that the Estate Edition of The Mechanism of Meaning , "although nominally held by the executors, is effectively in the custody and control of the Surrogate's Court," because the executors are "judicial appointees" acting pursuant to a decree of the Surrogate's Court and under its jurisdiction. Def. Mem. of Law (Def. Mem.) (Dkt. No. 22), at 2. Therefore, defendants argue, ABRF must challenge the Estate's ownership of the Estate Edition, if at all, in a turnover proceeding in the Surrogate's Court. Def. Mem. at 19.
Defendants supported their motion with the declaration of defendant Spencer, who described the course of the Surrogate's Court proceedings to date, attached various probate-related documents, and explained the status and whereabouts of the Estate Edition. Spencer Decl. ¶¶ 3-14. Spencer did not claim to have personal knowledge of the intent of Arakawa and Gins at the time of the gift. However, he marshaled various documents, including *631 many of the tax and estate administration records discussed above, in support of defendants' contentions on the merits; namely, that only the Sezon Edition was gifted to ABRF by means of the 1987 Deed; that the Estate Edition was Gins's personal property at her death; and therefore that it is now properly included among the assets of her Estate. See id. ¶¶ 15-38.
In its opposition papers, ABRF argued that the Estate Edition cannot be "in the custody of a state probate court," Marshall , 547 U.S. at 312, 126 S.Ct. 1735, because the Estate does not own it. See Pl. Mem. at 10-13. In plaintiff's view, the parties' jurisdictional dispute and their merits dispute are inextricably intertwined: "Unless and until the ownership issue is adjudicated, there is no basis to deem the property in the custody or control of the probate court."Id. at 12. Along with its brief, plaintiff submitted a declaration signed by Jane Gregory Rubin, Esq., the attorney who drafted the Deed in 1987. (Dkt. No. 28.) According to Rubin, the Deed was intended to "capture[ ] all of the works then related to the project, and any future manifestations of it." Rubin Decl. ¶¶ 7-8. Thus, she writes, the Deed "would have been understood by the parties to apply to both the first and second editions" of The Mechanism of Meaning . Id. ¶ 9. Plaintiff also submitted a 2009 email from Gins to Munroe, discussing a potential sale of "The Mechanism of Meaning," which - Gins wrote - would make it possible to reopen "the office of our architectural foundation." Post Decl. Ex. A.
E. Jurisdictional Discovery and Supplemental Submissions
At the initial case management conference on December 14, 2017, I stayed discovery pending the outcome of the instant motion (then only partially briefed), with two exceptions. First, I permitted ABRF to access and inspect certain boxes of documents that were removed from the Gins townhouse by the executors but that arguably belonged to (or at least contained documents relevant to) ABRF. See Order Regarding Jurisdictional Discovery, issued on December 20, 2017 (Dec. 20 Order) (Dkt. No. 29), at 6-7. Second, I permitted ABRF to take the deposition of defendant Spencer, "limited to jurisdictional issues." Id. at 7, 10.
In order to focus the jurisdictional discovery efficiently, I cautioned the parties: "[T]he jurisdictional question is whether plaintiff's claims, if pursued in this forum, would interfere with the 'administration of a decedent's estate' or dispose of property 'that is in the custody of a state probate court.' Marshall , 547 U.S. at 312, 126 S.Ct. 1735. The second branch of the probate exception turns on whether the state court has 'custody' or 'control' of the property in dispute, not whether the decedent had lawful title to it at the time of her death." Dec. 20 Order, at 8 (quoting Lefkowitz v. Bank of New York , 528 F.3d 102, 107 (2d Cir. 2007) ). "For jurisdictional purposes, therefore, this Court need not adjudicate whether ABRF or the Estate is the legal owner of The Mechanism of Meaning ." Id. at 9 (internal quotation marks omitted).
Following discovery, I gave the parties a schedule for supplemental briefing on the motion to dismiss. (Dkt. No. 34.) On April 2, 2018, plaintiff filed its Supplemental Memorandum of Law (Pl. Supp. Mem.) (Dkt. No. 40), along with the declaration of its counsel, David R. Baum, which in turn attaches various tax documents filed by ABRF from 1988 to 2013 and the transcript of the Spencer deposition. See Baum Decl. Exs. 1-10. Notwithstanding the Court's caution, plaintiff also submitted two additional declarations going primarily to the dispute over the ownership of the *632 artwork rather than the jurisdictional question.[5]
On May 4, 2018, defendants filed their reply memorandum and reply declarations. I heard oral argument on May 23, 2018, at which time I struck an unauthorized sur-reply memorandum filed by plaintiff and took the jurisdictional motion under submission. See Tr. of May 23, 2018 Oral Arg. (Oral Arg. Tr.) (Dkt. No. 60), at 68:2.
F. The Probate Action
There is no serious disagreement about the status of the probate proceeding. As noted above, Gins's will was admitted to probate and letters testamentary were issued in early 2014. The executors filed an Inventory in 2015, see Wallace Reply Decl. Ex. B, which does not list The Mechanism of Meaning by name but does correspond to an underlying appraisal of all of Gins's artwork. That appraisal includes the Estate Edition and values it at $4,980,000 "before blockage discount" and $1,245,000 "after blockage discount." Id. Ex. C, at 22. Spencer confirmed at deposition that the Surrogate's Court has not taken any affirmative action with respect to the Estate Edition - and likely lacks any knowledge of its existence, since it is not referred to by name in Gins's will, nor in any other document filed in the Surrogate's Court. Spencer Dep. Tr. at 42:23-43:5, 61:13-18, 123:11-13; see also Oral Arg. Tr. at 36:18-36:21.
Spencer further confirmed, at deposition, that no final accounting has been prepared in the probate proceeding and that most of the personal property and financial assets of the Estate have yet to be distributed - including the Estate Edition of the Mechanism of Meaning . Spencer Dep. Tr. at 40:12-41:4; see also Spencer Decl. ¶¶ 6-9; Wallace Reply Decl. Ex. C at 1. Thus, no interest in the disputed artwork "has been transferred to [RDF]," Spencer Decl. ¶¶ 7, 10, and no "action been taken in the Surrogate's Court" to convey it to RDF (or anyone else). Spencer Dep. Tr. at 41:5-41:10.[6] The executors have not informed the Surrogate's Court of ABRF's claim to the Estate Edition. Id. at 41:16-42:17. Nor has ABRF itself made any effort to resolve the ownership issue in Surrogate's Court. See Oral Arg. Tr. at 65:16-66:7. The townhouse at 124 West Houston Street has been sold. Id. at 11:19-21. According to defendants' counsel, that transaction did not require permission from the Surrogate's Court, but - like all Estate transactions - will at some point "be recorded in the accounting, intermediate or final accounting, of the estate." Id. at 30:20-31:4.
*633 II. APPLICABLE LAW
A. The Rule 12(b)(1) Standard
"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States , 201 F.3d 110, 113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the court "may refer to evidence outside the pleadings." Makarova , 201 F.3d at 113 ; see also Kamen v. Am. Tel. & Tel. Co. , 791 F.2d 1006, 1011 (2d Cir. 1986) ("when, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise"). The plaintiff has the burden of proof and "must prove the existence of subject matter jurisdiction by a preponderance of the evidence." Moser v. Pollin , 294 F.3d 335, 339 (2d Cir. 2002) ; accord Makarova , 201 F.3d at 113.
B. The Probate Exception
In Markham v. Allen , 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946), the Supreme Court held that a federal court is barred from exercising its jurisdiction "to disturb or affect the possession of property in the custody of a state court," but that it could "adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court." Id. at 494, 66 S.Ct. 296.
Sixty years later, in Marshall , the Court characterized the Markham formulation as "enigmatic," noting in particular that "[l]ower federal courts have puzzled over the meaning of the words 'interfere with the probate proceedings.' " 547 U.S. 293 at 295, 311, 126 S.Ct. 1735. Consequently, the Court effectively read the "interference" prong out of the test, preserving the rest of the Markham formulation and restating it as follows:
The probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.
Id. at 311-12, 126 S.Ct. 1735. The Court then held that the probate exception did not bar a federal bankruptcy court from adjudicating a claim by a widow that her late husband's son (who was also his executor) tortiously interfered with a gift that she expected by using various unlawful means to thwart his father's efforts to prepare a trust for her benefit. The Court noted, among other things, that the widow sought "an in personam judgment" against her stepson and did not "seek to reach a res in the custody of a state court." Id. at 312, 126 S.Ct. 1735.
In Lefkowitz , our Circuit explained that Marshall preserves federal jurisdiction where its exercise "will result in a judgment that does not dispose of property in the custody of a state probate court, even though the judgment may be intertwined with and binding on those state proceedings." 528 F.3d at 106. Consequently, "so long as a plaintiff is not seeking to have the federal court administer a probate matter or exercise control over a res in the custody of a state court, if jurisdiction otherwise lies, then the federal court may, indeed must, exercise it." Id.
The plaintiff in Lefkowitz , who had already spent "many years" litigating issues arising out of the administration of her parents' estates, filed a hodge-podge of estate-related claims against the executor *634 of those estates and others, alleging (for example) that the executor was "guilty of conversion because it 'wrongfully withheld [Estate] funds from plaintiff.' " 528 F.3d at 104, 107. The Court of Appeals held that her conversion claim was barred by the probate exception, id. at 107, as were other claims seeking "disgorgement of funds that remain under the control of the Probate Court," id. , but that her in personam claims, which sought damages for breach of fiduciary duty and related torts from defendants personally, "rather than assets or distributions from either estate," could proceed in federal court, even though they "undoubtedly intertwine with the litigation proceeding in the probate court." Id. at 108.
Faced with a motion to dismiss on the basis of the probate exception, a district court must satisfy itself that subject matter jurisdiction "otherwise lies," Lefkowitz , 528 F.3d at 106, and then engage in a two-part inquiry to determine whether the probate exception divests it of that jurisdiction. See also Wolfram v. Wolfram , 78 F.Supp.3d 758, 763 (N.D. Ill. 2015) ("Where federal-question or diversity jurisdiction would otherwise cover a claim, the probate exception, if it applies, takes that jurisdiction away."). First, the court asks whether the plaintiff seeks to administer an estate, probate a will, or conduct any other "purely probate matter." Lefkowitz , 528 F.3d at 106 (quoting Marshall , 547 U.S. at 312, 126 S.Ct. 1735 ; emphasis in the original). Second, it asks whether the plaintiff seeks to "reach a res in the custody of a state court." Id. (quoting Marshall , 547 U.S. at 312, 126 S.Ct. 1735 ). Because a district court "must take jurisdiction if it should," Marshall , 547 U.S. at 298, 126 S.Ct. 1735 (quoting Cohens v. Va. , 6 Wheat 264, 404, 5 L.Ed. 257 (1821) ), it may decline subject-matter jurisdiction under the probate exception "only if a plaintiff seeks to achieve either of these ends in federal court." Lefkowitz , 528 F.3d at 106.
III. ANALYSIS
A. The Estate Is Not a Proper Party Defendant
Under Fed. R. Civ. P. 17(b)(3), the Estate's capacity to sue or be sued is governed by New York law. See Wilmington Tr., Nat'l Ass'n v. Estate of McClendon , 287 F.Supp.3d 353, 373 (S.D.N.Y. 2018). Under New York law, a decedent's estate is not a legal entity capable of suing or being sued. Grosso v. Estate of Gershenson , 33 A.D.3d 587, 587, 822 N.Y.S.2d 150, 150 (2d Dep't 2006) (quoting 100 W. 72nd St. Assocs. v. Murphy , 144 Misc. 2d 1036, 1040, 545 N.Y.S.2d 901, 904 (Civ. Ct. N.Y. Co. 1989) ) ("An estate is not a legal entity and any action for or against the estate must be by or against the executor or administrator in his or her representative capacity."). Consequently, although defendants did not move on this ground, I respectfully recommend that plaintiff's claims against the Estate be dismissed. See Wilmington Tr. , 287 F.Supp.3d at 374. To the extent ABRF has asserted otherwise-cognizable claims against the Estate, it may pursue those claims against the executors in their representative capacity.
B. Jurisdiction "Otherwise Lies"
This Court's subject matter jurisdiction rests entirely on the federal question raised by plaintiff's Copyright Act claim. See 28 U.S.C. §§ 1331, 1338(a). The Declaratory Judgment Act "does not independently create federal jurisdiction," Warner-Jenkinson Co. v. Allied Chem. Corp. , 567 F.2d 184, 186 (2d Cir. 1977), and thus "is insufficient to confer federal jurisdiction ... in the absence of a controversy involving a federal question." Tasini v. New York Times Co. , 184 F.Supp.2d 350, 358 n.12 (S.D.N.Y. 2002). Plaintiff's conversion *635 and replevin claims raise purely state-law questions, thus coming within the Court's supplemental jurisdiction only to the extent they are "part of the same case or controversy" as the copyright claim. 28 U.S.C. § 1367(a).
In my view, plaintiff's copyright infringement claim is facially defective. Among other things it fails to allege that the copyrights upon which it sues have been registered. See Part III(G), infra. However, such a defect is not jurisdictional. Reed Elsevier, Inc. v. Muchnick , 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010). I therefore assume, for purposes of the Rule 12(b)(1) motion, that "jurisdiction otherwise lies," Lefkowitz , 528 F.3d at 106, and go on to consider whether the probate exception applies.
C. Plaintiff Does Not Ask this Court to Conduct any "Purely Probate Matter"
Because plaintiff does not ask this Court to "probate a will or administer an estate directly," Lefkowitz , 528 F.3d at 105, the first prong of the probate exception is not applicable. Indeed, since "few practitioners would be so misdirected as to seek, for example, letters testamentary or letters of administration from a federal judge, the first prong of the probate exception is rarely, if ever, violated." Moser , 294 F.3d at 340.
D. The Estate Edition is in the Custody of the Surrogate's Court
The threshold question, under the second prong of the Lefkowitz test, is whether the disputed property is in the "custody" or under the "control" of the state probate court." Lefkowitz , 528 F.3d at 106, 107. I answer that question in the affirmative.
The parties agree, as they must, that the Estate Edition is in the possession of the Gins Estate and under the control of her executors, who - pursuant to the letters testamentary granted to them by the Surrogate's Court - arranged for the physical artwork to be appraised, inventoried, and secured in a climate-controlled art storage facility along with the rest of Gins's art collection. See Compl. Ex. 5 (October 7, 2015 letter from ABRF to executors noting that the Estate has "possession" of the work and asking for its "return" from the "current inventory of the Estate of Madeline Gins"). Indeed, plaintiff's conversion and replevin claims - by definition - cannot be pursued against the Estate unless it has "possession" of the disputed property.[7] If and to the extent the Estate "engaged in improper licensing activity" related to images of The Mechanism of Meaning, see Compl. ¶ 45, that activity was also conducted by Gins's executors in their capacity as such, thus demonstrating their control over any allegedly infringed copyrights.
The parties also agree (or at least ABRF does not disagree) that it could litigate its claim to the Estate Edition (including its associated intellectual property) by initiating a turnover proceeding in the Surrogate's Court. See N.Y. Surr. Ct. Proc. Act § 2105 ; Mirvish v. Mott , 18 N.Y.3d 510, 942 N.Y.S.2d 404, 965 N.E.2d 906 (2012) (affirming Surrogate's Court ruling that decedent had made a valid *636 inter vivos gift of a valuable artwork to her companion some five years before her death and therefore that companion's assignee, rather than decedent's estate, was the "true owner" of the property); In re Matter of Grace , 61 Misc. 2d 1064, 1075, 308 N.Y.S.2d 136, 148 (Surr. Ct. Nassau Co. 1970) (resolving dispute between estate and W. R. Grace & Co. over ownership of biography of W.R. Grace by holding that "the estate is the owner of a one-half interest in the biography, including the literary property, the physical manuscript and the right to collect profits therefrom").
Nonetheless, ABRF contends that the Estate Edition is not within the custody of the Surrogate's Court because that court has not "taken any affirmative action regarding the property," and may not even know that it exists. Pl. Supp. Mem. at 5-6. Plaintiff's argument proves too much. None of the individual works in the possession of the Estate are described in the Inventory filed with the Surrogate's Court. See Wallace Reply Decl. Ex. B, at 9 (listing, as a single item, $9,642,934 worth of "[a]rtwork" created by Gins, Arakawa, or "others"). Moreover, although the Gins home was separately listed on the Inventory (along with various securities and bank accounts), it does not appear that the Surrogate's Court has taken any "affirmative action" with respect to any of those assets either. See Spencer Decl. Ex. A (Surrogate's Minutes as of November 2, 2017). Thus, plaintiff's logic would lead to the unsettling conclusion that none of Gins's assets are within the custody of the probate court charged with administering her Estate.
More fundamentally, the distinction that ABRF seeks to draw - between assets that are in the possession of the Estate and assets that are in the custody or control of the Surrogate's Court - is simply not meaningful in the context of ongoing probate proceedings. When the court-appointed executors of an estate take possession of property on its behalf, that property is deemed to be within the custody of the court that authorized them to do so. See Byers v. McAuley , 149 U.S. 608, 615, 13 S.Ct. 906, 37 L.Ed. 867 (1893) ("An administrator appointed by a state court is an officer of that court. His possession of the decedent's property is a possession taken in obedience to the orders of that court. It is the possession of the court , and it is a possession which cannot be disturbed by any other court.") (emphasis added); Bradley v. Roe , 282 N.Y. 525, 532, 27 N.E.2d 35, 39 (1940) (when administrators took possession of a stock certificate found in decedent's safe deposit box "subject to the order of the Surrogate, the property was in effect in the custody of the court"); Groman v. Cola , 2007 WL 3340922, at *6 (S.D.N.Y. Nov. 7, 2007) (holding that assets "in the possession of the Estate and its executors, who are officers appointed by the Surrogate's Court," are "in the possession and control of the Surrogate's Court"); U.S. Specialty Ins. Co. v. A-Val Architectural Metal Corp. , 2015 WL 3948115, at *5 (S.D.N.Y. June 29, 2015) (because "[t]he Surrogate's Court proceedings regarding the Blaskovic Estate are still ongoing," any "property or funds owned by the Blaskovic Estate are a res in the custody of a state court").
Abercrombie v. Andrew College , 438 F.Supp.2d 243 (S.D.N.Y. 2006), is not to the contrary. The property at issue in Abercrombie was a townhouse that Liddie Mae Murphy deeded to her alma mater some 15 years before her death. The deed was recorded, which in the case of real estate (which cannot be "possessed" in the same way that personal property can be possessed) "is prima facie evidence of delivery."
*637 Id. at 255 (citing Munoz v. Wilson, 111 N.Y. 295, 18 N.E. 855, 858-59 (1888) ).
Prior to Murphy's death, her niece, Abercrombie, sought to be appointed her guardian - apparently so that she could pursue an action in Murphy's name to invalidate the deed and inherit the property. That action was filed in a state court of general jurisdiction, then removed to federal court by Andrew College. After Murphy's death, Abercrombie became administratrix of her estate, and promptly sought to "divest this Court of jurisdiction" by filing a "shady Petition" in Surrogate's Court that purported to list the townhouse as an asset of the estate without mentioning the recorded deed - or even the fact that Abercrombie had previously filed suit against Andrew College, outside of the probate court, in an effort to annul that deed. 438 F.Supp.2d at 254-55.
Judge Karas refused to be divested, holding that the townhouse was not in the custody of the Surrogate's Court and therefore that the probate exception did not apply. As part of his analysis, Judge Karas noted that in the case before him, unlike Byers , there was no evidence "that the Surrogate's Court has taken any affirmative action regarding the Property." Id. at 254. "More importantly, however," Judge Karas continued, because the deed was recorded, the property was presumptively outside of the Murphy estate - and the administratrix could not rebut that presumption by filing false paperwork in the probate court. Id. at 254-55.
Here, by way of contrast, the disputed property is not real estate. The Estate Edition is personal property, capable of being physically possessed, and it "remained in [Gins's] full possession until her death." Abercrombie , 438 F.Supp.2d at 254 (discussing Byers ). Thereafter, the property passed into the possession of her duly-appointed executors, thus becoming an asset of her Estate - within the custody and control of the Surrogate's Court - until and unless a court of competent jurisdiction says otherwise. See Groman , 2007 WL 3340922, at *5 ("Because the ... shares were held by Pappas at the time of his death, they automatically became an asset of the estate."); Bradley , 282 N.Y. at 531-33, 27 N.E.2d at 38-39 (where plaintiff's stock certificate "was kept in the decedent's safe deposit box, mingled with her other property," executors acted properly in safeguarding the certificate "until the court itself was satisfied that the property claimed was not an asset of the decedent's estate") (emphasis added).[8]
ABRF asks this Court to "say otherwise" here and now, arguing that the documentary evidence it has amassed as to ABRF's entitlement to the Estate Edition is so "conclusive[ ]," "indisputable," and "irrefutable" that there is "absolutely no basis in law for the probate court to assert custody or control over the work." Pl. Supp. Mem. at 2; see also id. at 5 ("[T]here is no credible dispute that ABRF, and not the Estate, owns the work."). In fact, there is a credible dispute.[9] But even if the evidence *638 were as one-sided as ABRF contends, I would decline its invitation to put the cart before the horse.
Many probate exception cases include claims (like ABRF's) that an estate has wrongful possession of property rightfully owned by the plaintiff. In Lefkowitz , for example, plaintiff sought "declaratory relief by way of a judgment that certain assets of the Marsh estates 'are plaintiff's property.' " 528 F.3d at 107. Since the probate exception turns on whether the state court has "custody" or "control" of the property - not whether the estate has good title to it - there is no need or warrant for the district court to adjudicate the merits of such claims in order to determine its jurisdiction to do so. Thus, the Lefkowitz court agreed that plaintiff's claim for declaratory relief was properly dismissed, because "[t]o provide the relief [she] seeks ... the federal court would have to assert control over property that remains under the control of the state courts." Id. See also Carpenters' Pension Tr. Fund-Detroit & Vicinity v. Century Truss Co. , 2015 WL 1439868, at *6 (E.D. Mich. Mar. 27, 2015) (plaintiff's allegation that funds in dispute were "improperly" held by Estate did not preserve federal jurisdiction, because "[t]he provenance of the property constituting the corpus of the res is not relevant to whether the probate exception applies").
E. Plaintiff's Conversion, Replevin, and Declaratory Judgment Claims Should Be Dismissed under the Probate Exception
Having determined that the Estate Edition (including associated copyrights) is a res within the custody or under the control of the Surrogate's Court, I now consider whether any or all of plaintiff's claims seek to "dispose" of that property. Marshall , 547 U.S. at 312, 126 S.Ct. 1735. In my view, ABRF's state-law claims for conversion and replevin do just that, expressly seeking the "return" of the artwork "in its entirety," including "all physical works and intellectual property," as well as ancillary relief. Compl. ¶¶ 62, 66; id. at 19-20. These are classic in rem claims which, if successful, would result in an order requiring the executors to convey specific assets out of the Estate to ABRF. The probate exception bars this Court from issuing that order.
In Mandell v. Dolloff , 2018 WL 3553343 (D. Conn. July 24, 2018), reconsideration denied , 2018 WL 3677895 (D. Conn. Aug. 2, 2018), the plaintiff entered into a contract to purchase the decedent's home, only to learn that her executors had sold the house to a higher bidder. The would-be buyer sued for specific performance of the real estate contract, a declaratory judgment as to her rights in the property, and a constructive trust. Even though the house was no longer in the possession of the estate (having been conveyed to the *639 high bidder), the district court dismissed plaintiff's equitable claims pursuant to the probate exception, explaining that each of them "would require this Court to exercise control over property within the custody of the Probate Court when this action was filed, and thus, each falls outside this Court's jurisdiction." 2018 WL 3553343, at *3. See also Lefkowitz , 528 F.3d at 107 (affirming dismissal of conversion and related in rem claims because a federal court may not "dispose of property that is in the custody of a state probate court"); U.S. Specialty Ins. Co. , 2015 WL 3948115, at *5 ("this Court does not have jurisdiction to ... issue any injunction governing funds or property in the possession of the Blaskovic Estate"); Fisch v. Fisch , 2014 WL 5088110, at *3 (S.D.N.Y. Sept. 23, 2014) (dismissing claims in which "[p]laintiff is essentially seeking a declaration from this Court that a portion of the estate (or its equivalent amount of money) should go to him instead of to Defendant"); Newcomb v. Sweeney , 2013 WL 1774651, at *3 (D. Conn. Apr. 25, 2013) (dismissing claim seeking a determination "that [plaintiff] has title to an asset of the Decedent's probate estate, namely the IRA accounts," and is entitled to "proceeds of the IRA accounts").
Plaintiff relies on Genecin v. Genecin , 363 F.Supp.2d 306 (D. Conn. 2005), for the proposition that this Court may "adjudicate the rights of the parties" with respect to whether a disputed work of art was properly included in a decedent's estate. Pl. Mem. at 13-14. Genecin was a fight between two brothers over the ownership of a Toulouse-Lautrec lithograph. Id. at 309-10. Brother Paul claimed that their mother had gifted the Lautrec to him during her lifetime, and took it to his home in Connecticut "immediately following her death." Id. at 310. Brother Vincent, who was the personal representative of their mother's estate, denied the validity of the gift and "brought this action on behalf of the Estate in Connecticut federal court to regain possession of the Lautrec for the Estate." Id. Significantly, the artwork was not in the possession of the estate when Paul filed suit. On these facts, the court held that the probate exception did not apply. Id. at 311-12. Genecin is consistent with a substantial line of cases, both within and without our Circuit, reasoning that since the probate exception applies only when the res at issue is in the possession of the estate, it does not bar claims by executors to obtain or recover assets held elsewhere.[10] In this case, however, the shoe is on the other foot: as MacNair *640 wrote in his 2015 email, the Estate "has possession" of the res in its "current inventory," Compl. ¶ 40 & Ex. 5, meaning that plaintiff must go to the Surrogate's Court - not this Court - to litigate its claim of title to the same asset.
As to its declaratory judgment claim, ABRF argues that it "merely seeks a determination of ownership," which would not "interfere" with the probate court proceedings, Pl. Mem. at 13, "save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court." Pl. Supp. Mem. at 8 (quoting Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc. , 918 F.2d 1065, 1072 (2d Cir. 1990), which in turn was quoting Markham , 326 U.S. at 494, 66 S.Ct. 296 ). In evaluating the claim, however, I must "examine the substance of the relief" that plaintiff seeks, "not the labels [it has] used." Mandell , 2018 WL 3553343, at *4 (quoting Mercer v. Bank of New York Mellon, N.A. , 609 Fed. App'x 677, 679 (2d Cir. 2015) ).
ABRF asks this Court to declare that it "is the sole and exclusive owner of The Mechanism of Meaning in its entirety." Compl. at 19. Such a judgment would, as a legal matter, wholly dispose of specific property in the custody of a state probate court, Lefkowitz , 528 F.3d at 106, making the requested relief "virtually indistinguishable" in substance from the in rem relief sought in plaintiff's conversion and replevin claims, which are beyond the reach of this Court. Mandell , 2018 WL 3553343, at *4. Under similar circumstances, federal courts routinely dismiss declaratory judgment claims asserting ownership over specific estate assets. See, e.g. , Lefkowitz , 528 F.3d at 107 (affirming dismissal of claim seeking "declaratory relief by way of a judgment that certain assets of the Marsh estates 'are plaintiff's property' "); Three Keys Ltd. v. SR Util. Holding Co. , 540 F.3d 220, 229-30 (3d Cir. 2008) (explaining that a request to declare "a party's interest in specific property in the custody of the probate court" runs afoul of the probate exception, and directing the district court to dismiss claim seeking "a federal court determination of [plaintiff's] ownership interest in [certain specific shares of stock], which would dispose of Estate property under the jurisdiction of the Orphans' Court"); Mandell , 2018 WL 3553343, at *4 (dismissing declaratory judgment claim as to plaintiff's rights in the contested estate property); Newcomb , 2013 WL 1774651, at *3 (dismissing claim seeking a declaration "that [plaintiff] has title to an asset of the Decedent's probate estate, namely the IRA accounts"). I therefore recommend that plaintiff's declaratory judgment claim, along with its claims for conversion and replevin, be dismissed without prejudice to refiling in state court.
My recommendation as to the declaratory judgment claim is further informed by the Declaratory Judgment Act, 28 U.S.C. 2201(a), which "by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not." Dow Jones & Co. v. Harrods Ltd. , 346 F.3d 357, 359 (2d Cir. 2003). See Wilton v. Seven Falls Co. , 515 U.S. 277, 282, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."). Declaratory judgment claims thus do not fall within the usual admonition that a federal court "must take jurisdiction if it should." Marshall , 547 U.S. at 298, 126 S.Ct. 1735. In this case, retaining jurisdiction over the declaratory judgment claim while the Estate is subject to ongoing probate *641 proceedings would serve no "useful purpose" and would "improperly encroach" on the domain of the Surrogate's Court, which in any event offers plaintiff a "better remedy," in that all of its legal and equitable claims could be litigated in one forum. See Dow Jones & Co. , 346 F.3d at 359-60 (listing factors for district court to consider when declining declaratory jurisdiction and noting that such a decision "is reviewed deferentially, for abuse of discretion"). Therefore, even if plaintiff's declaratory judgment claim were not barred by the probate exception, this Court could - and in my view should - decline to hear it.
F. Plaintiff's Copyright Claim Should Be Dismissed under the Probate Exception
Plaintiff's copyright infringement claim presents somewhat different considerations. Like the claims that survived in Marshall and Lefkowitz , it is an in personam claim, in which ABRF principally seeks damages against RDF (for its publication of images of the Mechanism of Meaning ) and against the defendant executors (for their "improper licensing activity" to nonparties). See Compl. ¶¶ 44-45, 53. In personam claims for damages are ordinarily permitted to proceed in federal court (assuming an otherwise adequate jurisdictional basis), so long as the damages sought would not, in effect, require the disgorgement of specific property in the possession of the Estate. See, e.g. , Marshall , 547 U.S. at 312, 126 S.Ct. 1735 ; Lefkowitz , 528 F.3d at 107 ; Wilmington Tr. , 287 F.Supp.3d at 368 (holding that probate exception did not bar claim for judgment as to amount owed by the estate, arising under guaranty contract signed by decedent, which would not "dictate how the Estate's assets are to be distributed").
The remedies available under the Copyright Act include injunctions to prevent or restrain infringement, impoundment of unauthorized copies, actual or statutory damages, and attorneys' fees and costs. See 17 U.S.C. §§ 502 - 505. These remedies do not include declaratory or equitable relief concerning the true ownership of a copyright. Hepburn v. Concord Music Grp., LLC , 2015 WL 2084576, at *4 (C.D. Cal. May 4, 2015). Thus, a suit which merely seeks a declaration of ownership of a copyright, without alleging infringement, does not "arise under" the Copyright Act and cannot be a basis for federal question jurisdiction. Id. Accord Keith v. Scruggs , 507 F.Supp. 968, 970 (S.D.N.Y. 1981) ("actions to establish title do not 'arise under' the copyright laws").[11]
However, before ABRF can collect copyright infringement damages, it must establish all of the ordinary elements of copyright infringement, including "that the plaintiff owns the copyrights" and "that the copyrights have been registered in accordance with the statute." Gattoni v. Tibi, LLC , 254 F.Supp.3d 659, 661-62 (S.D.N.Y. 2017) (internal quotations and citation omitted). The first of these requirements *642 implicates the probate exception; the second raises a question as to the facial validity of ABRF's claim.
"The Copyright Act makes a certificate of registration from the U.S. Register of Copyrights prima facie evidence of the valid ownership of a copyright." Rogers v. Koons , 960 F.2d 301, 306 (2d Cir. 1992) (citing 17 U.S.C. § 410(c) ); see also Arista Records LLC v. Lime Grp. LLC , 2011 WL 1641978, at *2 (S.D.N.Y. Apr. 29, 2011) ("Under the Copyright Act, a certificate of registration constitutes prima facie evidence of the valid ownership of a copyright."). If the plaintiff is not "named on the registration as the owner," it has the "additional burden of proving valid chain of title" to the copyright. Arista Records , 2011 WL 1641978, at *2 (collecting cases).
ABRF does not allege, and likely cannot allege, that it holds a certificate of registration in its own name as to any of the copyrights on which it sues.[12] Rather, it claims title to "all intellectual property rights" in The Mechanism of Meaning , including copyrights, Compl. ¶ 2, by means of the same 1987 Deed under which it also claims title to the "material objects in which the work is embodied," that is, the paintings and any other physical components of the Estate Edition. See id. ¶¶ 2, 15; Pl. Mem. at 23-24; Rubin Decl. ¶¶ 7-8. As a practical matter, therefore, ABRF seeks to establish the same "chain of title" with respect to both the copyrights and the paintings.
Moreover, as discussed above, the allegedly infringed copyrights, like the paintings, are at present in the possession of the Estate, and thus within the custody and control of the Surrogate's Court. Indeed, the record contains several assertions of copyright ownership by the artists (after 1987) and by the Estate (after Gins's death), see, e.g. , Spencer Decl. Exs. G-H; Compl. ¶¶ 44-47 & Exs. 6, 8-9, but no countervailing evidence of any such assertion, or any other use or attempted use of the copyrights, by ARBF. And while a copyright, unlike a painting, cannot be kept in a warehouse, plaintiff has repeatedly alleged - for purposes of its conversion and replevin claims - that the Estate now has possession of what ABRF calls the "Deed of Gift Property," including "all physical works and intellectual property associated with the copyrights." Compl. at 19-20. See also Pl. Mem. at 23 (asserting that it is the rightful owner of the copyrights but that defendants "wrongfully appropriate[ed] ... that property").
Since the copyrights are presently in the possession of the Estate, and hence within the custody of the Surrogate's Court, this Court cannot grant relief on ABRF's infringement claims without adjudicating its claim to ownership of "property that remains under the control of the state courts," which is forbidden by Lefkowitz , 528 F.3d at 107. This is precisely the conclusion reached by the district court in Hollander v. Irrevocable Tr. Established by James Brown in Aug. 1, 2000 , 2011 WL 2604821 (C.D. Cal. June 30, 2011), in which the plaintiff alleged that she had a partnership with the musician James Brown during his lifetime and on the basis sought (a) a declaration that she was the owner of all of the copyrights and other intellectual property rights donated by Brown to an irrevocable trust, and (b) statutory damages *643 for copyright infringement, as well as "reimbursement for royalties owed." 2011 WL 2604821, at *1. Citing Lefkowitz , the court reasoned that even though the plaintiff's infringement claim nominally sought damages, her accompanying declaratory judgment claim "belies a thinly-veiled attempt to re-litigate broader claims regarding her ownership interest in the Trust and entitlement to Mr. Brown's intellectual property." Id. at *3. See also Sowande v. Moore , 2012 WL 13013029, at *1-2, n.3 (C.D. Cal. Sept. 24, 2012) (dismissing claims for "copyright fraud" against estate of Eleanor McKinney, because plaintiff sought to use the case to "establish valid title" to copyrighted works which were "presently part of the Estate of Eleanor McKinney," which was in probate).[13] I therefore recommend, respectfully, that defendants' Rule 12(b)(1) motion be granted as to plaintiff's claim for copyright infringement.
G. Alternatively, the Copyright Claim Should Be Dismissed For Failure to State a Claim
Even if it is not barred by the probate exception, ABRF's Copyright Act claim is facially defective. As noted above, a copyright infringement plaintiff must allege, among other things, "that the copyrights have been registered in accordance with the statute." Gattoni , 254 F.Supp.3d at 661. This element "captures the statutory requirement of Section 411(a) of the Copyright Act, which provides in relevant part that 'no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.' " Id. at 662 (quoting 17 U.S.C. § 411(a) ). See also BWP Media USA, Inc. v. Gossip Cop Media, LLC , 87 F.Supp.3d 499, 503 (S.D.N.Y. 2015) ("Although registration is not required to obtain copyright protection, ... it is a prerequisite to bringing an infringement action in federal court."); Small Business Bodyguard, Inc. v. House of Moxie, Inc. , 2014 WL 5585339, at *4 (S.D.N.Y. Oct. 30, 2014) ("Without a valid registration by the date the lawsuit is commenced, a party lacks standing to sue for copyright infringement.").
In this Circuit, moreover, "a pending application does not suffice." Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co. , 2012 WL 1021535, at *5 (S.D.N.Y. Mar. 26, 2012) (dismissing copyright infringement claims pursuant to Rule 12(b)(6) ). The plaintiff must "either hold a valid copyright registration outright or have applied and been refused a registration prior to filing a civil claim, both before and after Reed Elsevier . " Id. (emphasis in the original). See also Christians of California, Inc. v. Clive Christian New York, LLP , 2014 WL 2465273, at *4 n.1 (S.D.N.Y. May 30, 2014), on reconsideration , 2014 WL 3605526 (S.D.N.Y. July 18, 2014) (collecting cases); Zuma Press, Inc. v. Getty Images (US), Inc. , 2017 WL 2829517, at *4 (S.D.N.Y. June 29, 2017) ("Indeed, courts in this district are virtually unanimous on this point.").
*644 In Reed Elsev i er , the Supreme Court expressly left open the question whether "district courts may or should enforce [ § 411(a) ] sua sponte by dismissing copyright infringement claims involving unregistered works." 559 U.S. at 171, 130 S.Ct. 1237. Several district court cases within our Circuit have answered that question in the affirmative, dismissing copyright infringement claims sua sponte where the registration defect is plain from the face of the complaint. See Patrick Collins, Inc. v. John Does 1-7 , 2012 WL 1889766, at *2 (S.D.N.Y. May 24, 2012) (dismissing action without prejudice where plaintiff failed to allege "that it holds a valid copyright, has properly registered the copyright, or its application for a copyright was refused by the Copyright Office"); Eng v. Captain Blue Hen Comics , 2014 WL 2941280, at *2 (E.D.N.Y. June 30, 2014) ("Eng does not allege, in any of these three cases, that he has registered his copyrights with the Copyright Office, a precondition to an infringement suit.").
Here, as in Patrick Collins and Eng , the plaintiff fails to allege either that it holds a certificate of registration in its own name, or facts demonstrating a "chain of title" to a registration in the name of another, Arista Records , 2011 WL 1641978, at *2, as to any of the copyrights on which it sues. In fact, the Complaint fails to identify any specific copyright in any particular work, alleging instead, in the most general possible terms, that it owns "all copyrights" to The Mechanism of Meaning , Compl. ¶¶ 15, 41, 50, and that RDF infringed those "copyrights." Id. ¶¶ 44, 51.
The defect is not only plain from the face of the Complaint; it goes to the one cause of action on which plaintiff's assertion of federal jurisdiction hangs. Moreover, since ABRF has only identified one registered copyright relevant to this action - for a book published in 1978 - it is unclear whether ABRF can plead facts sufficient to establish standing to sue for the infringement alleged in this action, which consists principally of the display of website images of the painted panels that make up either the Sezon Edition or the Estate Edition. See Compl. ¶¶ 44-47. Both editions continued to evolve into the 1980s, see Compl. ¶¶ 17, 42, and two new panels were apparently created as late as 1996. See Spencer Decl. Ex. H, at ECF page 57.[14]
I therefore recommend, respectfully, that if ABRF's copyright claim is not dismissed pursuant to Rule 12(b)(1), it be dismissed sua sponte pursuant to Rule 12(b)(6), without prejudice, and that plaintiff be given leave to amend within 30 days of that dismissal.[15] I recognize that the parties have not briefed the sufficiency of *645 plaintiff's pleading, which in other circumstances could make an order to show cause more appropriate. Should plaintiff wish to stand on its current pleading, however, it will have the opportunity to make substantially the same showing during the objection period provided by 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).
IV. CONCLUSION
For the foregoing reasons, I respectfully recommend that Your Honor DISMISS all claims against the Estate pursuant to Fed. R. Civ. P. 17(b) ; DISMISS plaintiff's conversion, replevin, and declaratory judgment claims WITHOUT PREJUDICE pursuant to Rule 12(b)(1) ; and DISMISS plaintiff's copyright infringement claim WITHOUT PREJUDICE pursuant to Rule 12(b)(1) or, in the alternative, pursuant to Rule 12(b)(6).

ABRF was originally named Containers of Mind Foundation Inc., see Compl. ¶ 2, but, as in the Complaint, is referred to herein as ABRF.

There is some evidence that ABRF paid for restoration work in preparation for the Guggenheim exhibition. See Supplemental Declaration of Johanna Post (Dkt. Nos. 43, 58), ¶¶ 4-7 & Exs. 1-3. In addition, on the Acknowledgements page of the Guggenheim catalog, Arakawa and Gins express their gratitude to a number of "associates of the Architectural Body Research Foundation." Post Decl. Ex. E, at ECF page 3. Nothing in the catalog, however, suggested that ABRF had any ownership interest in the Estate Edition or any related copyrights.

The O'Toole-Ewald appraisal explains that "blockage" is "a discount applied to a sum of value where a quantity of very similar properties would impact a market at one date." Wallace Reply Decl. Ex. C, at 16. O'Toole-Ewald applied different blockage discounts to different groups of artworks within the Estate, ranging from 0% to 95%. Id. at 19-21. The Mechanism of Meaning paintings received a blockage discount of 75% because the artists "considered these paintings to be their most important works," but "there have been no auction sales of these works in the past five years," and "[t]here are 85 remaining paintings in this series." Id. at 20.

The current directors of ABRF may not have been aware of those 2011 returns at the outset of this action. Plaintiff now characterizes them as "obviously inaccurate," Pl. Mem. of Law (Pl. Mem.) (Dkt. No. 26), at 2, and blames defendant Spencer. See id. at 1-2 (asserting that Spencer "contrived a plan" to have the Estate Edition "falsely included in Arakawa's estate" so that it could ultimately pass to RDF, thereby evading the trustee's claw-back claim). Id. 1-2.

See Supp. Post Decl. ¶¶ 4-5 (attaching documents that "likely" reflect payments made by ABRF in 1996 to restore the Estate Edition for the Guggenheim exhibition in 1997); Declaration of Howard J. Freeman, Esq. (Dkt. No. 41), ¶¶ 5-10 (attesting that he was retained by Gins in 1994, on behalf of ABRF, to seek out a buyer for the Estate Edition). Freeman acknowledges that when he first reviewed the Deed he advised Gins that it "appears to convey only one of the two copies of the Mechanism of Meaning." Id. ¶ 7. However, Gins "clarified" the matter and "told me explicitly ... that the foundation owned the edition that had not been sold." Id. Thereafter, Freeman informed various prospective purchasers that ABRF was "the owner" of the " 'Mechanism of Meaning,' comprising 82 paintings (oil and acrylic on canvas), each 5'8? by 8'.? Id. Exs. 10, 12. "None of these letters ultimately led to an offer to buy the work." Id. ¶ 13.

At oral argument, defendants' counsel represented that the executors could not distribute the Estate Edition to RDF (or anyone else) without first providing notice to ABRF, as an "interested party." Oral Arg. Tr. at 10:18-11:1.

See Republic of Haiti v. Duvalier , 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dep't 1995) ("The tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner."); Nissan Motor Acceptance Corp. v. Scialpi , 94 A.D.3d 1067, 1068, 944 N.Y.S.2d 160, 162 (2d Dep't 2012) ("A cause of action sounding in replevin must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right.").

It is perhaps worth mentioning here, once again, that plaintiff's conversion and replevin claims do not allege any wrongdoing until after October 7, 2015, when defendants refused to "return" The Mechanism of Meaning to ABRF. See Compl. ¶¶ 61, 65. I note that similar conduct was held in Bradley , 282 N.Y. at 531-533, 27 N.E.2d at 38-39, not to constitute conversion. At a minimum, however, plaintiff's clear allegation that the executors' wrongful possession commenced in 2015 - not 2014 - demonstrates that the Estate Edition was an asset of the Gins Estate when the Surrogate's Court acquired jurisdiction.

As I have noted previously, see Dec. 20 Order at 2, the language of the Deed is less than crystal clear. Even attorney Freedman - who attests to his efforts to sell the Estate Edition on behalf of ABRF - concedes that when he first read the Deed he understood it to convey "only one of the two copies of the Mechanism of Meaning ." Freedman Decl. ¶ 7. That a trained lawyer should so interpret the Deed upon a first reading suggests that the significantly different interpretation that ABRF now champions is not entirely "indisputable." See Mercury Bay Boating Club Inc. v. San Diego Yacht Club , 76 N.Y.2d 256, 267, 557 N.Y.S.2d 851, 557 N.E.2d 87, 93 (1990) (under New York law, a court must first "examine the plain language of the Deed of Gift," because "the words used in the instrument itself are the best evidence of the intention of the drafter of the document"). Moreover, the artists themselves displayed some inconsistency over the years as to whether ABRF owned all editions of The Mechanism of Meaning . Most significantly, Gins represented to both federal and state tax authorities in 2011, under penalty of perjury, that the Estate Edition was Arakawa's personal property at his death. See Spencer Decl. Ex. M.

See, e.g. , Capponi v. Murphy , 772 F.Supp.2d 457, 466 (S.D.N.Y. 2009) (where defendants allegedly stole money from decedent prior to her death and deposited it in a New York bank, such that "the Virginia court administering her estate is not exercising in rem jurisdiction over these funds at this time," the administrator of decedent's estate could sue to recover the funds in federal court); Abercrombie , 438 F.Supp.2d at 255 (where disputed real estate was "not part of [decedent's] estate," probate exception did not bar federal court from ruling on claim by administratrix to invalidate recorded deed by which decedent had transferred possession of the property); Jimenez v. Rodriguez-Pagan , 597 F.3d 18, 24 (1st Cir. 2010) ("While divvying up an estate falls squarely within the probate exception, merely increasing it does not."); Gustafson v. zumBrunnen , 546 F.3d 398, 400 (7th Cir. 2008) (personal representative could sue to recover funds that should have been contributed to the estate pursuant to a prior agreement; probate exception did not apply because "[t]he judgment sought would just add assets to the decedent's estate; it would not reallocate the estate's assets among contending claimants or otherwise interfere with the probate court's control over any administration of the estate"); Wolfram , 78 F.Supp.3d at 764 (federal courts may "take jurisdiction over claims that would add assets to an estate currently undergoing probate") (emphasis added).

Nor, of course, could any remedy available under the Copyright Act dispose the ownership of the underlying painting, manuscript, or other "material object in which the work is embodied." 17 U.S.C. § 202 (ownership of a copyright is "distinct" from ownership of the material object). Moreover, the owner of that "material object" (including a lawfully owned copy of the work) retains the right to display it publicly, "without the authority of the copyright owner," to "viewers present at the place where the copy is located." 17 U.S.C. § 109(c). This provision permits the owner of a painting or other visual work to display it in a museum or gallery even if the copyright is owned by another. See, e.g. , Hoepker v. Kruger , 200 F.Supp.2d 340, 342 & n.1 (S.D.N.Y. 2002) (museum purchased work from artist and thereby "acquired the right to display [the work] without violating [the artist's] copyright").

The only copyright registration that plaintiff has identified in this action (see Dkt. No. 9) is Registration No. TX0000318931, issued in 1979 to Arakawa and Gins. According to the public online catalog of the United States Copyright Office (available at https://cocatalog.loc.gov (last visited August 24, 2018) ), this registration was issued for a "text" work; specifically, a 97-page book, published by H.N. Abrams in 1979, titled "Mechanism of Meaning: work in progress (1963-1971, 1978)."

Cf. Estate of Maier v. Goldstein , 2017 WL 5569809, at *5 (N.D. Ill. Nov. 20, 2017) (holding that the probate exception did not bar copyright infringement claim by estate against defendant currently holding copyright, because "what matters for purposes of the probate exception is whether the case interferes with property that is currently part of the estate") (emphasis in the original). As the Maier court explained (quoting Wolfram , 78 F.Supp.3d at 764 ), "a claim only interferes if it seeks a judgment against a specific thing and that thing is currently subject to the in rem jurisdiction of a state court." Id. (emphasis in the original.)

The Mechanism of Meaning may be "a conceptual work that incorporates different editions in various mediums," Compl. ¶ 41, but the Copyright Act does not protect concepts. See 17 U.S.C. § 102(b) ("In no case does copyright protection extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). Copyright protection "subsists ... in original works of authorship," including (as relevant here) "pictorial, graphic, and sculptural works," which must be fixed in a "tangible medium of expression" before copyright protection attaches. 17 U.S.C. § 102(a). See generally Reyher v. Children's Television Workshop , 533 F.2d 87, 90 (2d Cir. 1976) ("It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself.").

If ABRF is given leave to replead, it will not be sufficient for it merely to identify the copyright registration(s) that give it standing to sue. "A properly plead copyright infringement claim must allege 1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works , 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." Kelly v. L.L. Cool J. , 145 F.R.D. 32, 36 (S.D.N.Y. 1992) (emphasis added). This is normally accomplished by identifying each allegedly infringed work, providing the copyright registration number for that work, and describing when, where, and how the defendants infringed that copyright. See, e.g. , Schneider v. Pearson Educ., Inc. , 2013 WL 1386968, at *2 (S.D.N.Y. Apr. 5, 2013) (plaintiff adequately pleaded copyright infringement as to ten photographs by "enumerat[ing] not only the name and registration number of each work, but also the name of the Pearson publication or publications in which each work appeared").